JOSÉ ÁNGEL RUBERT ARMSTRONG ET AL., demandantes y recurridos, *v.* EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* R-65-110      *Resuelto:* 27 de junio de 1969

*J. B. Fernández Badillo, Procurador General, J. F. Rodríguez Rivera, Procurador General Interino,* abogados del recurrente; *Juan Enrique Géigel, Guillermo Silva, Hernán G. Pesquera* y *M. A. Giménez Muñoz,* abogados de los recurridos.

Sala Segunda integrada por el Juez Asociado Señor Hernández Matos como Presidente de Sala y los Jueces Asociados Señores Santana Becerra, Dávila y Torres Rigual.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Los demandantes-recurridos interpusieron demanda contra el Estado Libre Asociado de Puerto Rico para reivindicar dos predios de terreno que en la demanda se describieron así:

"Parcela Núm. 10—Principal (1) RÚSTICA: Finca radicada en el Barrio Monacillos de Río Piedras, término municipal de San Juan, compuesta de seis cuerdas con ochocientos noventa y seis milésimas de cuerda (6.896 cds.) equivalentes a dos hectáreas, setenta y una (71) áreas y quinientas noventa y cinco (595) centiáreas, en lindes por el NORTE, con el 'viejo Río Puerto Nuevo; por el SUR, con el nuevo Río Puerto Nuevo; por el ESTE y OESTE, con el viejo Río Puerto Nuevo'."

"Parcela Núm. 10—Principal (2) RÚSTICA: Finca radicada en el Barrio Monacillos de Río Piedras, término municipal de San Juan, compuesta de ciento veinte cuerdas con cuarenta y ocho céntimos de cuerdas (120.48 cds.), equivalentes a cuarenta

y siete (47) hectáreas, treinta y cinco (35) áreas, treinta y dos (32) centiáreas y cincuenta y cuatro (54) miliáreas, en lindes por el NORTE con el nuevo Río Puerto Nuevo; por el SUR, con terrenos de la finca principal San Patricio; por el ESTE, con el nuevo Río Puerto Nuevo, y terrenos de la finca principal San Patricio; y por el OESTE, con la Quebrada Barraco."

Por Resolución Conjunta Núm. 13 de 13 de marzo de 1956, el Estado Libre Asociado de Puerto Rico otorgó su consentimiento para que se le demandara en este caso en lo referente a la reivindicación de las parcelas anteriormente descritas, las cuales se describieron en igual forma en dicha Resolución Conjunta.

A todos los fines del litigio, la Parcela Núm. 10 ha sido un solo cuerpo de 129.74 cuerdas deslindado en el Plano de Mangles del Pueblo de Puerto Rico en la Bahía de San Juan, levantado oficialmente por el Gobierno de Puerto Rico en 4 de diciembre de 1919. Véase dicha Parcela en el ANEXO-A que es una copia fotográfica de una porción de dicho Plano oficial. El Gobierno de los Estados Unidos segregó de este cuerpo 2.29 acres que constituyen un pasaje dentro de la Parcela, uniendo los puntos 636 y 695 en dicho ANEXO, dejándola dividida en Parcela Núm. 10 Principal (1) y Parcela Núm. 10 Principal (2), con las descripciones dadas en la demanda, y reducida el área total de 129.74 a 127.376 cuerdas. Esta segregación no está en litigio.

Después de un juicio en los méritos en que se aportó cuantiosa prueba documental, complementada con la declaración de testigos de una y otra parte, y efectuada una inspección ocular, la Sala de San Juan del Tribunal Superior dictó sentencia en 11 de mayo de 1965 decretando que los demandantes son los legítimos dueños de la Parcela Núm. 10 en litigio, Principal (1) y Principal (2); ordenando la cancelación en el Registro de la Propiedad del título inscrito del Estado Libre Asociado sobre dicha parcela y ordenando el

PARCELA #10
AREA: 50 Ms. 99As. Y 14cs.
= 129.74 cuerdas.
Pueblo de Puerto Rico

SAN PATRICIO

ANEXO "A"

CAÑO UBARRI

PARCELA NO. 11
AREA: 4.5 Hs. 96As.84Cs =
118.96 cuerdas DE PUERTO RICO
PUEBLO DE PUERTO RICO

RIO PUERTO NUEVO

PARCELA #12

LUIS LLORENS TORRES

IRIARTE HERMANOS

43.13 CDAS.

SUCN. RAMOS

QUEB. BARRACO

LUIS RUBERT

BAHIA DE SAN JUAN

BAYAMON A SANTURCE

cese de toda intervención del Estado contra los demandantes en la finca.

*Historial del título en controversia de los demandantes*

(1) En 17 de diciembre de 1881 Don Antonio Ramos y Mencos tramitó un expediente posesorio ante el Juez Municipal de Río Piedras en el que expuso ser dueño de la Hacienda denominada San Patricio en el Barrio Monacillos de Río Piedras, compuesta de 760 cuerdas de terreno más o menos en un solo cuerpo, colindando por el Norte con el río de Río Piedras que atraviesa la estancia denominada "Puerto Nuevo"; por el Oeste con la quebrada Margarita, la Sucn. de Don Ramón Arroyo y el Presbítero Don Manuel Díaz Caneja; por el Sur con Don Gerónimo Landrau; por el Este con Landrau y el río citado; y se compone de terrenos de vegas, sobre vegas y montes, conteniendo edificios que se describen. Dijo haber adquirido dicha finca por herencia de su padre Don Antonio Ramos Sandoval a la muerte de éste en 6 de febrero de 1854, desde cuya fecha la ha poseído como dueño sin interrupción de nadie. (1)

Acompañó al escrito certificación del Alcalde, del Regidor Síndico y del Secretario del Ayuntamiento de Río Piedras al efecto de que de acuerdo con el archivo municipal, resultaba que Don Antonio Ramos y Mencos era dueño de la finca San Patricio, de 760 cuerdas según descrita, y que a nombre propio pagaba las contribuciones correspondientes a la misma.

Admitida la información, fueron citados y oídos los colindantes quienes expresaron no tener objeción al expediente, si bien el colindante Presbítero Manuel Díaz Caneja hizo constar que aunque no se oponía, debía entenderse que su lindero con el Sr. Ramos era "el caño de la quebrada Margarita siguiendo el rumbo a dos pilares de mampostería

---

(1) El río de Río Piedras y el río Puerto Nuevo que tantas veces se mencionarán es el mismo río.

línea recta a la zanja de dicha quebrada y no por donde corren hoy las aguas." ([2])

Oídos los testigos quienes declararon que el solicitante había estado en posesión como dueño de la referida finca desde que la heredó en 1854, el juez municipal declaró probada la posesión de la finca a favor del Sr. Ramos desde que la heredara en el año 1854, sin perjuicio de tercero, y ordenó la inscripción a su favor en el Registro de la Propiedad conforme a lo dispuesto en la Ley Hipotecaria, inscripción verificada el 4 de enero de 1882 al folio 176, tomo 26 de Río Piedras, finca Núm. 89, inscripción 1ra. (Dtes. Exh. 1.)

(2) Por escritura Núm. 534 de 12 de julio de 1893 otorgada ante el Notario Don Mauricio Guerra-Mondragón, Don Antonio Ramos y Mencos vendió la finca San Patricio a Don Leopoldo Cerecedo. Se describió la misma en cuanto a la cabida de 760 cuerdas y colindancias igual a como fue descrita en el expediente posesorio, si bien ahora se adicionó la siguiente descripción más detallada:

"Los puntos y guardarrayas de la finca descrita son los siguientes. 'Empezando en la desembocadura del río de Río Piedras se encuentra el cañuelo de la Quebrada Margarita, y de este punto aguas arriba á encontrarse con el camino antiguo de Guainabo donde colindan las fincas 'Puerto Nuevo' y 'Pueblo Viejo arriba': al partir de este punto en línea recta á la Cabesa de la hoya llamada 'Barraco' y de aquí aguas abajo a encontrarse con la punta ó esquina de un palenque de emajagua que atraviesa á encontrarse con la citada quebrada 'Margarita' y de aquí aguas abajo á la desembocadura del río donde empesó.' "

Idéntica descripción detallada de la finca San Patricio se hizo en la escritura pública de 28 de noviembre de 1815 ante el Notario Don Francisco Acosta, en virtud de la cual Don Antonio Ramos Sandoval, padre y causante del vendedor

---

([2]) Esta alegación del Presbítero colindante resultó luego en un pleito entre la Sucn. Ramos y él que terminó por sentencia de este Tribunal de 29 de junio de 1906: *Sucn. Ramos* v. *Díaz Caneja*, 11 D.P.R. 211 (1906).

Don Antonio Ramos y Mencos, adquirió la Hacienda San Patricio de la viuda del Coronel Don Jaime O'Daly, y en donde se expresó que la finca colindaba por el Norte y Este con el Río Puerto Nuevo, y por el Oeste con la quebrada Margarita hasta su desembocadura.

El ANEXO-B es un plano de la finca San Patricio según estos linderos, y por donde discurrían las aguas de la quebrada Margarita en el 1885 cuando surgió el litigio sobre la dirección de su cauce inestable, resuelto en definitiva en 11 D.P.R. 211 (1906).

Hicieron constar las partes que se eliminaban de la venta 80 cuerdas que estaban en litigio con el Presbítero Díaz Caneja, por lo que se traspasaron a Cerecedo la diferencia de 680 cuerdas más o menos. Este traspaso quedó igualmente inscrito en el Registro de la Propiedad a favor del adquirente Cerecedo, inscripción 13 de la finca Núm. 89. (Dtes. Exh. 2; Exh. 15.)

(3) A petición de su dueño Cerecedo Hnos., en 20 de julio de 1901 el ingeniero Camilo González realizó una mensura de la finca San Patricio adquirida por ellos de Ramos. Según el certificado de mensura y el plano levantado de igual fecha, la Hacienda San Patricio colinda por el Norte con el río de Río Piedras, y Pablo Ubarri; por el Sur con terrenos de Gerónimo Landrau, por el Este con Landrau y el río de Río Piedras y por el Oeste con la *quebrada Barraco*, terrenos de la Sucn. Arroyo y terrenos de la Sucn. Ramos que están en litigio con el Presbítero Díaz Caneja. Esta mensura arrojó dentro de los lindes descritos una cabida de 776 cuerdas de las cuales 64 cuerdas eran montes; 26 cuerdas de maleza; 38 cuerdas de mangles; 64 cuerdas de poyales; 86 cuerdas de vega; 100 cuerdas de sobrevegas; 390 cuerdas de pastos más una superficie ocupada por la vía del ferrocarril equivalente a 8 cuerdas.

El ANEXO-C([3]) es el Plano levantado por el ingeniero González en virtud de esta mensura. (Dtes. Exhs. 4 y 5.) Según el cuadro de acotaciones de puntos, ángulos, distancias, rumbos y estaciones, unido al certificado de mensura, la misma comenzó en el punto 1 dentro de un círculo; de ahí al noreste al punto 2, puente del ferrocarril; de ahí al noroeste siguiendo el curso río abajo de las aguas hasta el punto 3, desembocadura en el río de la quebrada Barraco; de ahí aguas arriba por el curso de esta quebrada hacia el sur hasta el punto 4 y de ahí al punto 1 de partida.

(4) Por escritura de Venta Núm. 45 otorgada en Barcelona el 17 de enero de 1916 ante el Notario Don Melchor Canal y Soler, Don Luis Rubert y Catala, causante de los demandantes, adquirió de un causahabiente de Don Leopoldo Cerecedo la finca San Patricio con cabida de 680 cuerdas descrita en forma igual a los anteriores documentos y al Registro. Esta adquisición quedó igualmente inscrita bajo la finca Núm. 89. (Dtes. Exh. 3.)

(5) En 20 de septiembre de 1919, Rubert y la Sucn. Ramos, condueños de la finca San Patricio, solicitaron en la Corte Municipal de Río Piedras la conversión en inscripción de dominio de la posesión inscrita en 1882 a favor de Antonio Ramos. Hicieron constar que si bien en dicho expediente posesorio se le dio a la finca descrita una cabida de 760 cuerdas más o menos, la misma era errónea, y que practicada después la mensura por agrimensores competentes y aparatos adecuados, resultaba tener dentro de los linderos y puntos referidos, 900 cuerdas de cabida, siendo el exceso de 140 cuerdas menos de una sexta parte de la cabida inscrita. Seguidos los trámites de rigor con la publicación de

---

(3) NOTA DEL COMPILADOR: No se imprime el Anexo "C"—"Plano de la Finca Denominada San Patricio Propiedad de los Señores Cerecedo Hermanos & Cía, sita en el Barrio Monacillos, Jurisdicción de Río Piedras"— por no haber sido posible obtener una buena copia para su reproducción. Dicho Anexo puede ser examinado en el expediente oficial del caso en la Secretaría del Tribunal Supremo.

FINCA LAS MONJAS

PABLO UBARRI

RIO DE RIO PIEDRAS

O PUERTO NUEVO

CARR. EN PROYECTO 775 M.

200 MS.

397 CDAS.

BAHIA DE SAN JUAN

CAÑO CARBONERO

CAÑO CENTRAL

CAMINO A SANTURCE

HOY IRIARTE HERMANOS

MARGARITA

SUPERFICIE
Seboruco del Rey

CAÑO SEBORUCO del REY

CAÑO DE LA CALETERA LA CALETERA CUBIERTO POR RAMAJE

QUEB. DE LAS YAGUAZAS (ANTES BARRACO)

DIVISORIA DE LLORENS Y RUBERT

SUPERFICIE

CAMINO AL MUELLE

NACIMIENTO DE AGUA

CAÑO ARTIFICIAL abierto por PRESBITERO CONEJA

QUEBRADA FANEGA

MANUEL DIAZ

SEBORUCOS DE MALA TIERRA

QUEB. MARGARITA

CARR.

PALENQUE MAJAGUA

A.R.R. CO.

CAMINO A PUEBLO VIEJO

NACIM. DE AGUA

MONTE

680 CDAS.

GERONIMO LANDRAU

HOY JOSE S. ARROYO CESTERO

NACIMIENTO DE AGUA

PLANO TOTAL HACIENDA
"SAN PATRICIO"
"COMPUESTA: DE 1077 CDS." (680 CDAS DE DON
LUIS RUBERT Y 397 CDS DE DN. LUIS LLORENS TORRES
RADICADA EN EL BO. MONACILLOS DE RIO PIEDRAS.
Escala: 1:5.000 MS.

ANEXO "B"

los correspondientes edictos, en 28 de octubre de 1919 la Corte Municipal dictó sentencia decretando la conversión en dominio de la posesión originalmente inscrita a favor de Ramos, con la cabida rectificada de 900 cuerdas. (Dtes. Exh. 8.)

(6) Por escritura Núm. 32 de Divisoria, otorgada ante el Notario Don Luis Abella Blanco en 27 de septiembre de 1919, comparecieron Don Luis Rubert Catala y los causahabientes de Don Antonio Ramos fallecido en 14 de enero de 1894, y expresaron que si bien en el expediente posesorio tramitado por Ramos se dio a la finca una cabida de 760 cuerdas más o menos, practicada una mensura por agrimensores competentes con aparatos adecuados, dentro de los linderos descritos en dicho expediente la finca tenía una cabida de 900 cuerdas. Hicieron referencia a la venta realizada por Ramos a favor de Cerecedo traspasándole 680 cuerdas y reservándose el vendedor 80 cuerdas más o menos que estaban en litigio. Este remanente según mensura de la totalidad del inmueble resultaba ser de 220 cuerdas más o menos de terreno de vega y mangles; que por escritura de 10 de junio de 1894, Núm. 670, ante el Notario Don Mauricio Guerra, los herederos causahabientes de Don Antonio Ramos se adjudicaron el resto no vendido a Cerecedo de la referida finca; que en consecuencia la Hacienda San Patricio pertenecía a la fecha de este documento a Don Luis Rubert Catala y a los herederos de Ramos, siendo el resto perteneciente a los herederos de Ramos de 220 cuerdas más o menos; que por error notarial y por error del Registro al efectuarse la venta de Ramos a Cerecedo por la escritura Núm. 534 de 12 de julio de 1893, no se consignó que la parte vendida era una segregación de la totalidad del inmueble, ni se hizo un deslinde y descripción, a fin de que pudiera inscribirse como finca aparte en el Registro de la Propiedad, quedando inscrita la venta sin hacerse segregación bajo el mismo Núm. 89

de la finca así como sucesivos traspasos; que con el fin de subsanar dichos errores las partes deslindaban ambas porciones para formar fincas separadas, describiéndose la parte vendida a Cerecedo, ahora Rubert, de la siguiente manera:

"*RUSTICA* denominada 'San Patricio', radicada en el barrio de Monacillos, en el término municipal de Río Piedras, compuesta de seiscientas ochenta cuerdas, equivalentes a doscientas sesenta y siete hectáreas con veinte y seis áreas y sesenta y cinco centiáreas de terreno de vegas, sobre-vegas, montes, poyales y manglares; colindando, por el Norte, con el río de Río Piedras que atraviesa la estancia 'Puerto Nuevo', por el Oeste con el resto de la finca principal propiedad de la sucesión Ramos Buist y con la sucesión de don Ramón Gutierrez del Arroyo (hoy tierras de don José S. Cestero); por el Sur con don Jerónimo Landrau; y por el Este con el citado Landrau y el río de Río Piedras; conteniendo dicha finca casa de habitación de altos de madera y bajos de mampostería, casa de hornallas y ranchos y varias casas para peones."

y describiéndose la parte correspondiente a la Sucn. Ramos de la siguiente manera:

"*RUSTICA* denominada 'Monterrey', radicada en el barrio de Monacillos en el término municipal de Río Piedras, compuesta de doscientas veinte cuerdas, más o menos, equivalentes a ochenta y seis hectáreas con cuarenta y seis áreas y ochenta y seis centiáreas de terreno de vega, poyales y manglares; colindando por el Norte con el río de Río Piedras; por el Oeste, con la quebrada Margarita que la separa de las tierras del Presbítero don Manuel Díaz Caneja (hoy de los hermanos Iriarte); por el Este con la finca segregada propiedad de don Luis Rubert; y por el Sur, con la misma finca segregada y con las tierras de la sucesión de don Ramón Gutierrez del Arroyo (hoy de don José S. Cestero); conteniendo dicha finca un ranchón u ordeñadero y varias casitas para peones."

En el mismo documento Rubert dio su conformidad a una venta pendiente de la parte de los Ramos a Don Luis Llorens Torres, renunciando a cualquier derecho de preferencia que pudiera corresponderle como sucesor de Cerecedo en virtud de

cláusula de preferencia consignada en el título de éste. Convinieron las partes expresamente que si en consecuencia de los mangles que reclama el Pueblo de Puerto Rico o por cualquier otra causa resultare menor la cabida total del inmueble principal que se ha dividido, la pérdida o disminución que resultare no afectaría en lo más mínimo al predio segregado como Hacienda *San Patricio* de Rubert, sino que dicha pérdida o rebaja sería imputada y afectaría solamente al predio *Monterrey* de los Ramos, al igual que cualquier exceso si lo hubiere.

De todo lo dispuesto en el anterior documento, del aumento en cabida de 760 a 900 cuerdas en la totalidad, y del aumento de 80 a 220 cuerdas en la porción Monterrey de los Ramos, se tomó razón en el Registro de la Propiedad, inscribiéndose la porción San Patricio como finca aparte al folio 182 del tomo 46 de Río Piedras, finca Núm. 2034, inscripción 1ra., y quedando inscrito el remanente de los Ramos bajo el número original 89 de la finca. (Dtes. Exh. 7.)

(7) Por escritura Núm. 20 sobre Determinación de Colindancias, otorgada en 3 de julio de 1922 ante el Notario Don Luis Abella Blanco, Rubert Catala y Don Luis Llorens Torres, dueño ahora de la porción Monterrey de 220 cuerdas, manifestaron que sus respectivos predios, Monterrey y San Patricio, colindan entre sí (véase Dte. Exh. 7) y las partes han respetado la quebrada "Barraco" por el cauce que tiene en el plano de 19 de julio de 1901, Anexo-C, como línea divisoria; y que para precisar definitivamente la colindancia y para transar cualquier diferencia o exceso de terreno que hubiera, acordaron que la quebrada "Barraco" era definitivamente la divisoria entre sus fincas y la colindancia por el Oeste de la porción San Patricio, de Rubert; que todo terreno al Este de dicha quebrada pertenecía a Rubert exclusivamente, y al Oeste de la exclusiva pertenencia de Llorens; que Llorens aquí cedía y traspasaba a Rubert cualquier terreno al Este de la quebrada en exceso de las 680 cuerdas

registradas de Rubert, y Llorens seguía dueño de 220. Este traspaso se hizo por la suma de $3000 que Llorens recibió de Rubert en el acto, y así quedaba transigida entre ellos toda controversia sobre el lindero Oeste de San Patricio y cualquier exceso de cabida. De lo anterior se tomó nota en el Registro de la Propiedad, al margen de las respectivas fincas Núm. 89, Monterrey; y Núm. 2034, San Patricio. (Dtes. Exh. 9.)

En carta de Llorens a Rubert de 19 de junio de 1922 relacionada con la anterior escritura, Llorens le informa que seguirá defendiendo el pleito de los manglares (*Pueblo de Puerto Rico* v. *Luis Llorens Torres*, Civil #12685, reivindicación) y Rubert le pagaría $300 en concepto de honorarios por dicho pleito. Rubert, en carta de igual fecha, se comprometió a pagar la mitad de los gastos de dicho pleito. (Dtes. Exh. 14.)

(8) Por escritura Núm. 21 aclaratoria de descripción de finca, otorgada en 3 de julio de 1922 ante el Notario Don Luis Abella Blanco, Rubert Catala describió la finca según se ha dicho antes pero hizo constar que aunque el inmueble aparecía inscrito con una cabida de 680 cuerdas, de la mensura realizada por el ingeniero Camilo González aparecía tener una cabida real de 776 cuerdas según el plano levantado (Dtes. Exhs. 4 y 5) y solicitó que así quedara rectificada la cabida en el Registro de la Propiedad, lo cual ocurrió por la segunda inscripción de dicha finca Núm. 2034. (Dtes. Exh. 10.)

(9) Antes del título escriturario de la finca San Patricio de que se tiene conocimiento (la escritura de 28 de noviembre de 1815) se sabía de la existencia de dicha finca como tal, según aparece del Diario de Disposiciones y Órdenes del Brigadier Don Ramón de Castro, Gobernador Intendente y Capitán General de Puerto Rico en relación con el ataque de los ingleses, desde el 17 de abril de 1797, en que aparecieron a la vista buques enemigos. El día 18 se hizo constar:

"Llegó noticia de que una partida enemiga compuesta de veinte a treinta hombres había llegado hasta el sitio de Baña-caballos y de que había saqueado los ingenios inmediatos de D. José Giral y D. Jaime O'Daly sitos en Puerto Nuevo y San Patricio." Ya desde 1780, en informe que rindiera el Gobernador al Rey de España identifica la hacienda San Patricio con el río Puerto Nuevo. Estos datos históricos identifican la hacienda San Patricio con el río Puerto Nuevo, que siempre ha sido su colindancia Norte.

*Historial del título del demandado Estado Libre Asociado*

(10) El 8 de abril de 1913 el Departamento de lo Interior envió una comunicación a Don Luis Rubert como apoderado del Sr. Cerecedo y arrendatario de su finca, anunciándole que se había dispuesto efectuar el deslinde y mensura de los terrenos y manglares pertenecientes al Gobierno Insular alrededor de la Bahía de San Juan y con tal motivo le suplicaba que permitiera a los empleados de dicho Departamento la entrada a la finca San Patricio, necesaria dicha entrada para colocar banderas en los cerros y partes altas de ellos para vértices de la triangulación que había de servir de base a la mensura. Se pidió al Sr. Rubert los títulos de la propiedad del Sr. Cerecedo para estudio y se anunció que cuando se fuera a determinar el lindero con la propiedad del Sr. Cerecedo se le notificaría oportunamente a fin de que presenciara la mensura.

En 22 de abril de 1913 contestó el Sr. Rubert como apoderado del Sr. Cerecedo manifestando estar dispuesto a darle al Gobierno todas las facilidades para el deslinde y mensura pero que, para su protección, un empleado del Departamento y otro designado por él debían hacer el deslinde de los terrenos que poseía el Sr. Cerecedo sin que ello prejuzgara la cuestión de propiedad.

En 8 de mayo de 1913 el Sr. Rubert envió al Departamento el título del Sr. Cerecedo que le fue devuelto en mayo 16 siguiente. Nada demuestra la prueba en cuanto a

lo ocurrido con posterioridad a estas comunicaciones, y cómo se efectuó el deslinde y la mensura. (Ddo. Exh. E.)

(11) En 28 de mayo de 1918 el Gobernador de Puerto Rico emitió el Boletín Administrativo Núm. 143, una Proclama, declarando bosques insulares todos los manglares de la costa de la Isla de Puerto Rico e islotes adyacentes, pertenecientes a El Pueblo de Puerto Rico, Proclama que se emitió bajo la autoridad del Art. 2 de la Ley Núm. 22 de 22 de noviembre de 1917, "Ley estableciendo un Servicio Forestal en Puerto Rico". Todos los manglares de la Isla de Puerto Rico fueron descritos en la referida Proclama, y en lo que se refiere a este litigio, se incluyó un manglar de 1003.61 cuerdas descrito:

"Manglar de la Punta de Cataño, Ensenada de Pueblo Viejo, Sabana-Hoyos, Caño de San Fernando, Santa Catalina, Portuguez, Boca del Río de Puerto Nuevo, Caño de El Seboruco de Rey y de Quebrada Margarita. Lindantes por el Norte con la bahía de San Juan; Sur, terrenos de Marcos T. Caneja, Eduardo González Caneja y los de la Suc. Ramos; Este y Oeste, manglares." (Ddo. Exh. G.)

(12) Incuestionablemente, como consecuencia de la mensura y deslinde antes dichos y de la Proclama, se levantó por El Pueblo de Puerto Rico el Plano Oficial de dicho Manglar de la Bahía de San Juan de 1003.61 cuerdas. (Ddo. Exh. C), al cual nos referimos al principio, fechado en 4 de diciembre de 1919, y del cual el ANEXO-A representa una porción. En este plano, ANEXO-A, está deslindada la Parcela Núm. 10 en litigio con su cabida de 129.74 cuerdas, con el río de Río Piedras o río Puerto Nuevo por su Norte, y con la quebrada Barraco por su Oeste.

(13) En 18 de junio de 1940 el entonces Comisionado de lo Interior, Sr. José E. Colom, expidió certificación dirigida al Registrador de la Propiedad solicitando se procediera a inscribir a nombre del Pueblo de Puerto Rico varias parcelas, entre ellas la Parcela Núm. 10 aquí en litigio, que

fue descrita con una cabida de 129.74 cuerdas, como terreno bajo cubierto por manglares, y colindando por el Norte con el río Puerto Nuevo; por el Sur con terrenos de Luis Rubert y la Hacienda San Patricio; por el Este con la Hacienda San Patricio y por el Oeste con un caño donde desemboca la quebrada denominada "Barraco" que separa de manglares propiedad de la Sucn. de Petra de la Torre, antes Luis Llorens Torres. (Ddo. Exh. A.)

La autoridad invocada en su certificación por el Comisionado de lo Interior para solicitar la inscripción en el Registro a favor del Pueblo de Puerto Rico de la referida parcela y otras más, según deslindada en el Plano de 1919, fue el Art. 13 de la Ley Orgánica de 12 de abril de 1900 (Acta Foraker) y la Ley del Congreso de los Estados Unidos aprobada el 1ro. de julio de 1902 titulada "Ley autorizando al Presidente de los Estados Unidos a reservar terrenos públicos y edificios en la Isla de Puerto Rico para uso público, y cediendo otros terrenos y edificios públicos al Gobierno de Puerto Rico." En esa forma la Parcela Núm. 10 obtuvo su primera inscripción a favor del Pueblo de Puerto Rico al folio 64 del tomo 140 de Río Piedras, finca Núm. 6971, el 25 de junio de 1940.

(14) En 20 de noviembre de 1940 y por escritura Núm. 16 otorgada ante el Notario R. B. Pérez Mercado, el Pueblo de Puerto Rico traspasó a Estados Unidos la Parcela Núm. 10 conjuntamente con otras parcelas deslindadas en el Plano de Manglares de 1919 ya referido, y Estados Unidos inscribió su título sobre la misma. (Ddo. Exh. A-1.)

(15) En 11 de enero de 1950 y por la escritura Núm. 1 de Segregación y Traspaso otorgada ante el Notario Francisco A. Quirós Méndez, los Estados Unidos de América traspasaron de nuevo al Gobierno de Puerto Rico la referida Parcela Núm. 10, y otras más, sujeto a ciertas segregaciones hechas por Estados Unidos, entre ellas, la segregación de 2.29 acres dentro de la Parcela Núm. 10 a que

hicimos mención al principio en la página 591. El Gobierno de Puerto Rico inscribió su derecho nuevamente sobre la Parcela Núm. 10.

### Conformidad de las fincas en litigio

Surge de lo anteriormente expuesto que cada parte hace descansar su derecho de propiedad a la finca en litigio en un título escriturario inscrito a su favor sin limitación alguna en el Registro de la Propiedad. Ante esa situación es preciso determinar, antes de entrar en la consideración del derecho de los litigantes, si la Parcela Núm. 10 y la finca de los demandantes son congruentes en toda o en parte de su extensión.

Si se coloca el Plano ANEXO-A sobre los Planos ANEXOS-B y C de modo que coincidan en los tres el curso del Río Puerto Nuevo, el punto donde la quebrada Barraco desemboca en dicho río y el curso de la quebrada Barraco, surge incuestionablemente que la Parcela Núm. 10, según aparece deslindada en el Plano Oficial de 4 de diciembre de 1919 ocupa el polígono o porción noroeste de la finca San Patricio siendo el vértice de dicho polígono el punto donde desemboca la quebrada Barraco en el río. No puede haber duda que la Parcela Núm. 10 inscrita a favor del Gobierno forma parte en toda su extensión de la finca San Patricio según ésta fue adquirida por Rubert y después de la segregación de la parte Monterrey, que retuvo Ramos, con el Río Puerto Nuevo como la colindancia Norte de ambos predios y la quebrada Barraco como la colindancia Este de Ramos y Oeste de Rubert. Forzosamente hay que llegar a la conclusión que la Parcela Núm. 10 está en toda su extensión dentro de los linderos conocidos ya desde 1815 de la finca San Patricio.

### El derecho de las partes a la propiedad en litigio

(1) *El de los demandantes recurridos.*

Los demandantes basan su derecho de propiedad en los

títulos escriturarios con su inscripción sin defecto en el Registro de la Propiedad y en la posesión pública, quieta, pacíficamente disfrutada por ellos y sus predecesores a título de dueños.

En adición a su prueba documental antes reseñada, los demandantes ofrecieron prueba testifical. Se admitió por estipulación la declaración del Sr. Rafael Villamil, dada en un pleito anterior entre las partes. [4] Declaró el testigo que se hizo cargo de la finca San Patricio desde el 10 de agosto de 1927 como mayordomo y administrador; que le entregaron la finca por sus puntos y linderos; describió dichos linderos coincidiendo con la prueba documental; que la finca se dedicaba a cañas y la administró hasta el año 1948 en que fue vendida para edificarse la urbanización Puerto Nuevo. Manifestó que la porción del terreno en el rincón entre el Río Puerto Nuevo y la quebrada Barraco se utilizaba para madera de espeques para las verjas y lo demás era pasto. Que todo era aprovechable en esa esquina. Que en ningún momento fue interrumpido durante los años que estuvo administrando la finca en cuanto a porción alguna. Que nadie pretendió ser durante ese tiempo dueño de la finca y que siempre estuvo en posesión de la misma como mayordomo de Rubert. Declaró que la esquina noroeste que se usaba para sacar espeques y pastar ganado era donde estaba el mangle, el río y la quebrada Barraco, la esquina del río con dicha quebrada; que esa esquina podría tener 100 cuerdas más o menos y tenía parte seca de malojillo. Con miras al Plano del Gobierno, la esquina noroeste a que se refería coincidía con la Parcela Núm. 10 en litigio. A preguntas del Estado:

"P.—En esa esquina del Río Puerto Nuevo y Quebrada Barraco, qué clase de monte había ahí? R.—Mangle.

P.—Esos mangles los utilizaba para espeques? R.—Sí, señor.

---

[4] Corte de Distrito de San Juan, Civil #7674.

P.—El mangle es apropiado para espeques? R.—Bastante bueno para espeques.

P.—Espeques para qué? R.—Para cercas.

P.—Los sacaba en qué cantidad? R.—Depende del consumo que hubiese.

P.—Eso era continuo? R.—Donde hay caña y ganado hay reparación constante de verjas.

P.—Esa verja de qué era? R.—De alambre de púa.

P.—Y los postes eran de madera? R.—Sí, señor.

P.—Específicamente eran de mangle los postes? R.—Sí, señor.

P.—Eso es una práctica corriente hacer verjas con postes de mangle? R.—Sí, señor.

P.—No lo usaron para ningún otro fin que para espeques? R.—En leña, los agregados la usan para leña, para cocinar.

P.—Qué agregados? R.—De la finca.

P.—Esos mangles están en terreno firme? R.—Sí, señor.

P.—Se puede transitar por ahí? R.—En parte se moja los pies y en parte más hondo y más llano.

P.—Y cuando sube la marea? R.—En parte entra y en parte no.

P.—Qué parte de esa esquina que marcó en el plano cubría la marea? R.—En la misma esquina no cubría, bien adentro entraba un poco porque la esquina es alta.

P.—Era alta por configuración del terreno o se rellenó? R.—En parte se rellenó pero a toda la orilla del río era alta antes de rellenarse.

P.—Qué ganado tenía usted bajo su administración? R.—Bueyes, vacas, becerros.

P.—Qué pastos había en esa parcela? R.—En esa parte había malojillo.

P.—De eso usted está seguro? R.—Seguro.

P.—Está seguro que estamos hablando de la misma parcela? R.—Sí, señor.

P.—De la parcela que por el Norte tiene el río y por el Oeste la quebrada? R.—En parte había malojillo.

P.—Habrá actualmente malojillo? En el 1948 la última vez que la vio? R.—Yo salí en marzo de 1948.

P.—Y había malojillo? R.—Sí, señor.

P.—Sembrado o de clase silvestre? R.—Silvestre pero malojillo bueno.

P.—El que diga que son poyales no es verdad? R.—Hay poyales y malojillos, no es todo general.

P.—Reit rándose(⁵) del Río Puerto Nuevo directamente al Sur, donde terminan los pollales qué distancia hay entre el río y donde terminan los pollales? R.—Para afuera o de la orilla del río?

P.—Del río hacia adentro de la finca. R.—Creo que debe haber 150 o 200 metros.

P.—Camina 200 metros? R.—Para llegar al río, del río a lo alto.

P.—Usted tiene una idea qué es una cuerda? R.—Sí, cómo no.

P.—Usted ha medido? R.—Mucho he medido.

P.—Con cadenas? R.—Y varas.

P.—De cuántas cuerdas era San Patricio? R.—Exacto no sé porque no me ocupaba de planos. Creo que pasaba de 600 cuerdas; exacto no sé.

P.—Sembrado de cañas cuántas había? R.—Yo tenía dos colonias unidas y habían 600, 400 o 500 cuerdas.

P.—Había alguna otra colonia además de las dos? R.—San Patricio y Puerto Nuevo.

P.—En la de San Patricio cuántas colonias de cañas tenía? R.—Una sola.

P.—De cuántas cuerdas en cañas? R.—En San Patricio 350 a 400 cuerdas de cañas.

P.—Y el resto? R.—Pasto, porque teníamos mucho ganado.

P.—De 350 a 400 cuerdas de cañas. Cuántas cuerdas de poyales y manglares había en la finca San Patricio? R.—Poco más o menos 80 ó 100 cuerdas.

P.—Esos mangles están localizados en un sólo sitio de la finca? R.—En una esquina.

P.—La que usted habla? R.—Sí, señor.

P.—Usted nunca vió a nadie meterse en esa finca en el tiempo que usted fué administrador de ella? R.—Cuando la draga enderezó el río.

P.—Cuándo fué eso? R.—Creo que fué por el 1947; no estoy seguro.

P.—Pero antes de usted entregar? R.—Por el 1946, un par de años antes.

P.—Antes de usted entregar? R.—Sí, señor.

---

(⁵) Así aparece en el original.

P.—Usted no vió nunca allí oficiales del Navy? R.—Nunca.

P.—Ni vió empleados del Navy? R.—No, señor.

P.—No vió ingenieros haciendo mensuras? R.—No, señor.

P.—Únicamente con excepción del enderezamiento del río? R.—Sí, señor. Del Navy no he visto nada.

P.—Quién enderezó el río? R.—Los de la draga; me dijeron que era el Gobierno y como era una cosa que beneficiaba siempre le indiqué algo al jefe mío.

P.—Quién era el jefe suyo? R.—René Jiménez.

P.—Cuál era el cargo de Jiménez? R.—Era allá en la Central, pero él era el jefe mío que venía a la finca.

P.—Usted era el administrador de San Patricio? R.—Mayordomo.

P.—Usted personalmente no le indicó nada al Sr. Rubert? R.—No, señor.

P.—Ni se le ocurrió que la gente que llevó la draga lo hicieran creyéndose que eran dueños? R.—Primeramente abrieron un caño y estaba el río bastante ciego y era beneficioso.

P.—Ciego con qué? R.—Con la tierra que botaba la draga.

P.—Tapiado? R.—No, lleno de 'bahote' y los desagues los tenía tapados y al abrir me beneficiaba.

P.—Ahí no se hizo una zanja hace varios años durante la incumbencia suya de la finca para desaguar de la finca grande de San Patricio? R.—Sí, había un desague.

P.—Quién lo hizo? R.—El Army, no fué el Navy.

P.—Pero usted me dijo que nadie. R.—Lo hicieron porque yo insistí con un teniente que se entendía con los asuntos de la malaria y yo conseguí que me abrieran eso.

P.—Fué un favor especial para usted? R.—Sí, beneficioso para el asunto de la malaria.

P.—Cuando dice que enderezaron el río, le cambiaron el curso? R.—Sí, señor, quedó de la propiedad de San Patricio una cuerda al lado del Norte del río que era propiedad y eso yo se lo reporté al Sr. Rubert.

P.—Lo que era la finca San Patricio? R.—Sí, cogió una orilla de San Patricio el río.

P.—Ese río siempre tuvo su cauce bien definido? Usted lo veía allí? R.—Siempre tenía su mismo ancho; los recodos había más.

P.—No se desbordaba? R.—Cuando crecía la marea, sí.

P.—Hasta dónde llegaba la marea? R.—Se entraba y volvía a bajar; entraba a la pieza de cañas; entrar y salir.

P.—Eso era dos veces al día la marea? R.—Dos veces en las 24 horas."

Declaró por los demandantes el testigo Pedro Díaz Monroig quien dijo haber estado relacionado con la finca San Patricio desde el año 1912 en que vino a trabajar en ella como obrero, y luego fue mayordomo. Estuvo allí trabajando hasta que vendieron la finca en el año 1947. Describió los lindes de la finca coincidiendo con la prueba documental. Refiriéndose al sector o esquina formada por el Río Puerto Nuevo y la quebrada Barraco en su desembocadura, dijo que había una parte de terreno húmedo que lo cubría la marea cuando subía y ahí se sacaban postes para la cerca. Cuando las mareas eran grandes es que cubrían esa parte húmeda, pero cuando no eran grandes se podía caminar por ahí con zapatos. El resto de la finca se usaba para caña y crianza de ganado. Se sembraba caña casi hasta la misma boca de la quebrada, como media cuerda o una cuerda antes de llegar a la quebrada Barraco. En esa esquina se echaban las vacas a pastar.

A preguntas del Estado declaró que esa finca no estuvo ocupada por el *Navy*. Que el gobierno militar compró a Rubert una parte pero la Marine no ocupó la finca.

El Sr. José Rubert Armstrong declaró haber estado atendiendo la finca desde el 1927 y explicó que al vendérsele la propiedad a Long para la urbanización Puerto Nuevo se encontraron con el hecho de que en el Registro aparecía parte de la misma, la Parcela Núm. 10, inscrita a favor del Pueblo de Puerto Rico. Para no interrumpir la transacción con Long procedieron a segregar esta parte y vendieron el resto. La segregación se hizo por escritura Núm. 1400 ante el Notario Juan Rodríguez de Jesús en 19 de diciembre de 1947. (Dtes. Exh. 11.) Declaró el testigo que su padre no fue interrumpido por el Pueblo de Puerto Rico en la posesión

de la finca antes de 1947; que la Marina nunca había tomado posesión de la misma y que había pedido permiso para hacer una rectificación del caño. A la posesión de los demandantes, pública y pacíficamente a título de dueños, se une la posesión en igual concepto, luego convertida en dominio, acreditada judicialmente en 1881 a favor de Ramos desde 1854, y la de su causante. [6]

(2) *El del demandado recurrente.*

El demandado y recurrente Estado Libre Asociado pretende sostener su derecho de propiedad sobre la Parcela Núm. 10 en el Tratado de París, en la Sec. 13 de la Ley Foraker, en la Ley del Congreso de 1ro. de julio de 1902, y en determinaciones administrativas de agencias del Gobierno Español.

Por el Art. VIII del Tratado de París de 11 de abril de 1899, la Monarquía española cedió en Puerto Rico a Estados Unidos . . . "todos los edificios, muelles, cuarteles, fortalezas, establecimientos, vías públicas y demás bienes inmuebles que con arreglo a derecho son del dominio público, y como tal corresponden a la Corona de España."

Se aclaró inmediatamente en el Tratado, que dicha cesión

---

[6] En 10 de febrero de 1948 los demandantes interpusieron demanda de *injunction* contra el Comisionado de lo Interior Sr. Jorge J. Jiménez alegando que él y el Almirante Daniel Barbey habían penetrado ilegal y violentamente en su propiedad y habían realizado actos perturbadores de la posesión de los demandantes. (Cte. Distrito San Juan, Civil Núm. 7674.) Por las razones que se exponen en nuestra decisión de *Armstrong* v. *Sánchez Vilella, Com.,* 74 D.P.R. 171 (1952), no prosperó el *injunction.* Pero dijimos al final: "Si a estas alturas los demandantes pueden proseguir con éxito contra el Pueblo de Puerto Rico una acción reivindicatoria, una acción sobre sentencia declaratoria o un procedimiento para cancelar la inscripción que a virtud del expediente de dominio obtuvo el Pueblo de Puerto Rico es algo que no está ahora ante nos y que, por ende, no nos concierne. (El Pueblo inscribió mediante certificación expedida al Registrador por el Comisionado de lo Interior.)

Aparte de lo transcrito y de las otras consideraciones que se usaron para emitir dicha decisión, no surge de ese caso que los actos de perturbación alegados ocurrieron precisamente en el sitio donde está deslindada la Parcela Núm. 10 objeto de este otro pleito.

a que se refiere el párrafo anterior "en nada puede mermar la propiedad, o los derechos que corresponda, con arreglo a las leyes, al poseedor pacífico, de los bienes de todas clases de las provincias, municipios, establecimientos públicos o privados, corporaciones civiles o eclesiásticas, o de cualesquiera otras colectividades que tienen personalidad jurídica para adquirir y poseer bienes en los mencionados territorios renunciados o cedidos, *y los de los individuos particulares*, cualquiera que sea su nacionalidad." (Énfasis nuestro.) (Traducción según Tomo 1 L.P.R.A. pág. 20.) ([7])

La Sec. 13 de la Ley Foraker de 12 de abril de 1900, 31 Stat. 80, dispuso que todas las propiedades que pudieran haber adquirido en Puerto Rico los Estados Unidos por la cesión de España en el Tratado de Paz, "en puentes públicos, casas camineras, fuerza motriz de agua, carreteras, corrientes no navegables, y los lechos de las mismas, aguas subterráneas, minas o minerales bajo la superficie de terrenos particulares, y toda propiedad que al tiempo de la cesión pertenecía, bajo las leyes de España entonces en vigor, a las varias Juntas de Obras de Puertos de Puerto Rico, y *todas las orillas de los puertos*, muelles, embarcaderos y terrenos saneados, pero sin incluir la superficie de los puertos o aguas navegables", quedaban "bajo la *dirección*" del gobierno establecido por dicha Ley Foraker para ser "*administrados* a beneficio de El Pueblo de Puerto Rico."

Por la Ley del Congreso de 1ro. de julio de 1902, se autorizó al Presidente para, dentro de un año de la aprobación de la Ley, hacer reservas de terrenos y edificios públicos pertenecientes a Estados Unidos en la Isla de Puerto Rico para fines militares, navales, cuarentenas, faros, correo, aduana, cortes de Estados Unidos y otros fines públicos, que el

---

([7]) El texto en inglés promulgado por Estados Unidos como reza es: ". . . cannot in any respect impair the property or rights *which by law belong to the peaceful possession of property of all kinds,* of . . . , or of private individuals . . . ." (Énfasis nuestro.)

Presidente creyere necesarios, y todos los terrenos y edificios públicos, sin incluir áreas de bahías, ríos y cuerpos de aguas navegables y las tierras sumergidas debajo de éstos, propiedad de los Estados Unidos en la Isla y no reservados según dicha Ley, se cedieron al Gobierno de Puerto Rico para que los mantuviera y dispusiera de ellos para uso y beneficio del pueblo de la Isla, siendo esta cesión a condición expresa de que el Gobierno de Puerto Rico renunciaría a cualquier interés o reclamación en los terrenos y edificios reservados por el Presidente bajo las disposiciones de esa Ley. 32 Stat. pág. 731.

Las anteriores disposiciones del Tratado de París, de la Ley Foraker y de la Ley de 1902 que invoca el Estado en apoyo de su derecho de propiedad, nos obligan a considerar qué bienes de los aquí disputados pertenecían a la Corona de España susceptibles de haber sido cedidos a Estados Unidos en 1898.

Refiriéndose a los bienes baldíos en ultramar, expone Alcubilla, *Diccionario de la Administración Española*, 4ta. Ed., Tomo 1, pág. 861, que las leyes del Tit. XII, lib. IV de la Recopilación de Indias, sobre el repartimiento de solares y tierras a los nuevos pobladores y su enajenación de las no repartidas o cultivadas, dispusieron que labrándolas y poblándolas de ganado, árboles, etc., adquirían *dominio* sobre los terrenos a los cuatro años de morada y labor, y que las no repartidas, y en que no hubiera composición, se vendieran a *vela y pregón*, dándose a censo al quitar.

Por Real Cédula de 15 de octubre de 1754 se dieron instrucciones para la venta y composición de los terrenos realengos. Comenta Alcubilla que hubo de cometerse abusos en tan importante asunto ya que por Real Orden de 11 de junio de 1814, se encargó a la Intendencia de La Habana que cuidase de que se observaran las Leyes de Indias y la Real Cédula de 1754, *y de que se respetase a los propietarios que, según ellas*, hubieren obtenido la adquisición legal,

*"no admitiendo los jueces el menor recurso de corporación
ni pueblo alguno contra aquellas tierras, que ya deslindadas
y medidas, deben aplicarse a su dueño en virtud de título o
merced, composición o compra."* (Énfasis nuestro.)

Esta Real Orden es de 11 de junio de 1814, sólo un año
antes de la venta, por la viuda de O'Daly a Ramos Sandoval,
padre de Ramos Mencos, de la finca San Patricio, ya cono-
cida así y situada en ese sitio por lo menos desde 1780.

Por otra Real Orden de 16 de julio de 1819, después de
la adquisición por título de Ramos Sandoval, se comunicaron
a la Intendencia del Ejército reglas para que *se respetasen
como títulos legítimos de dominio* las mercedes de tierras
concedidas por los Cabildos y Ayuntamientos hasta el 1729,
y a falta de otro título, *la prescripción de 40 años.*

De haberse suscitado un problema de dominio al decre-
tarse esta Real Orden de julio de 1819, ya habían transcu-
rrido más de 40 años que el Ingenio San Patricio era finca
conocida ubicada en ese sitio.

Reales órdenes de 1834 y 1858 se manifestaron en igual
sentido de respetar y proteger el dominio de los que tenían
tierras.

La Ley de 16 de mayo de 1835, promulgada 20 años
después de haber adquirido Ramos Sandoval por título es-
crito de O'Daly conocida como Ley de Bienes Mostrencos,
transcrita en el Tomo VI de Scaevola, ed. 1891, pág. 527,
dispuso en su Art. 1 que pertenecían al Estado los siguientes
bienes semovientes, muebles e inmuebles, derechos y pres-
taciones:

"Primero. Los que estuvieren *vacantes* y *sin dueño cono-
cido* y por *no poseerlos* individuo o corporación alguna." (Én-
fasis nuestro.)

En su Art. 3 decretó que "También corresponden al Es-
tado los bienes detentados o poseídos sin título alguno, los
cuales podrán ser reivindicados con arreglo a las leyes co-
munes." Y el Art. 4 dispone que "En esta reivindicación,

*incumbe al Estado probar* que no es dueño legítimo el poseedor o detentador, *sin que éstos puedan ser compelidos a la exhibición de títulos* ni inquietados en la posesión hasta ser vencidos en juicio." (Énfasis nuestro.)

De haber surgido contienda entre el Estado Español y los Ramos a partir de la Ley de 1835 sobre el título de la propiedad San Patricio, el Estado hubiera tenido que ser el actor en pleito ordinario como cualquier otro litigante, con el peso de la prueba para establecer su derecho, sin que hubiera podido compeler a los Ramos a exhibir sus títulos.

Compárese lo anterior con la mera Certificación enviada al Registro en 1940 por el Comisionado de lo Interior, como único título escriturario para inscribir la Parcela Núm. 10 a favor del Estado.

En 17 de abril de 1884, después de tener Antonio Ramos Mencos inscrito su título en el Registro de la Propiedad, se promulgó el Real Decreto de esa fecha aprobando el "Reglamento para la Composición de Terrenos Realengos en Puerto Rico".

El Art. 1ro. de dicho Reglamento dispuso que se considerarían como realengos para los efectos del mismo, *y con arreglo a la Ley 14, tit. XII, lib. IV de la Recopilación de Indias,* todos los terrenos *"baldíos, suelos y tierras que no tengan dueño particular legítimo,* o lo que es lo mismo, que no hayan pasado *nunca* al dominio privado en virtud de concesión gratuita u onerosa por parte de las autoridades competentes." (Énfasis nuestro.)

En el Art. 2 se dispuso que se considerarían propietarios a los efectos del Reglamento, entre otros, los que acreditaren título de autoridad competente, y haber cumplido las condiciones impuestas, "e igualmente se considerarán propietarios los que, careciendo de título, *acrediten haber poseído sin interrupción los expresados terrenos durante veinte años, si se encuentran* en cultivo, y durante treinta si se hallan *incultos."* (Énfasis nuestro.) Un terreno se consideraba cul-

tivado por el Reglamento si lo había estado en los últimos 3 años, Alcubilla, *op. cit.*, pág. 865. El período de 40 años de la Real Orden de julio 16, 1819, quedó reducido a 30.

De haberse suscitado pugna entre el Estado Español y Ramos a tenor de dicho Reglamento de Composición, la situación era que al regir el mismo en 1884 ya Ramos había acreditado judicialmente ante la Corte Municipal de Río Piedras e inscrito una posesión pública, pacífica y a título de dueño de 69 años, más de dos veces el período de 30 años ahora dispuesto.

En *El Pueblo* v. *Dimas*, 18 D.P.R. 1061 (1912), haciendo referencia a este Reglamento de Composición de Terrenos Realengos de 17 de abril de 1884, dijimos, págs. 1078-1080, que cuando el litigante en ese caso se dirigió al Gobierno, invocando dicho Reglamento, él no había adquirido *tampoco* un título por prescripción bajo sus disposiciones.

En *Pueblo* v. *Rojas*, 53 D.P.R. 121 (1938), hicimos igualmente referencia al mencionado Reglamento de Composición. A la pág. 131 expresamos que es de conocimiento judicial que en su origen, la totalidad territorial de la Isla de Puerto Rico pertenecía a la Corona de España por razón de descubrimiento y conquista, pasando gradualmente a la propiedad particular parte de ella por concesiones onerosas o gratuitas hechas por el Gobierno Central, por título de amparo concedido por la Junta de Terrenos Baldíos y Realengos *"y mediante posesión adversa extintiva del derecho dominical"*, (Énfasis nuestro.) para concluir más adelante, pág. 136, que ante los hechos probados, no era "difícil llegar a la conclusión de que *al efectuarse en la isla el cambio de soberanía, no se había consolidado en el apelante el dominio sobre el inmueble reclamado* en la demanda. En otras palabras, *en aquella fecha* el apelante no podía ostentar un título ganado *a virtud de posesión* durante *treinta* años o más." (Énfasis nuestro.)

Hemos citado las anteriores leyes, órdenes y Decretos del Gobierno Español sólo como un fondo histórico legislativo para demostrar la actitud altamente proteccionista de la Corona de España hacia los ocupantes y poseedores de tierras, pero no porque sea de directa aplicación el Reglamento de Composición de 1884, ya que a su promulgación, la Hacienda San Patricio no eran terrenos *baldíos ni realengos* según ahí se definen, ni eran terrenos sin dueño conocido como ahí se expresa. (⁸)

Tampoco San Patricio, con sus lindes precisos conocidos cuando menos desde 1815 según el ANEXO-B, eran bienes de los expresamente mencionados en el Art. VIII del Tratado de París que en 10 de diciembre de 1898 al firmarse el Tratado pasaron a Estados Unidos, ni eran otros bienes inmuebles que, conforme a dicho Artículo, "con arreglo a derecho" pertenecían en esa fecha a la Corona de España.

A todo lo anteriormente dicho, nada ha opuesto el Estado Libre Asociado que destruya la titulación escrituraria y del Registro de la finca San Patricio, altere sus lindes y ubicación o que refute su posesión conocida en manos privadas por más de un siglo al 10 de diciembre de 1898.

■ La posición del Estado Libre Asociado, y éste es el esencial fundamento de su alegado derecho de propiedad, es que la Parcela Núm. 10 en litigio constituye un bien de dominio y uso públicos de los de aquella categoría que no son susceptibles de enajenación y *posesión* privada, por ser

---

(⁸) Entre las Reales Órdenes antes mencionadas, la de 15 de octubre de 1754, ratificada por la de 11 de junio de 1814, al darse instrucciones sobre *terrenos realengos y su composición*, la Corona se preocupaba aún por los de los indios y encargaba a los jueces y subdelegados que, en su cumplimiento, "procedieran con suavidad, templanza y moderación, respecto de las tierras que poseían y necesitaban los indios"; y por la Real Orden de 1ro. de marzo de 1834 "se trató de escogitar medio de *proveer de título de propiedad* a las *poseedores* de terrenos en los dominios de Indias, *para que gozasen de la seguridad y confianza debida.*" (Énfasis nuestro.)

de eminente uso público por la naturaleza de los mismos. Veamos:

Ya en la Tercera Partida del Rey Alfonso el Sabio, año de 1256, se distingue entre bienes de dominio público del Estado y los de uso público no alienables. Comienza el Título XXVIII de dicha Partida: "Gana ome, o pierde el señorío en las cosas, non tan solamente por los juyzios de los Judgadores, de que fablamos en los Títulos ante deste; más aun en otras muchas maneras que mostraremos en las leyes deste Título."

La Ley III: "Las cosas que comunalmente pertenescen a todas las criaturas que biuen en este mundo, son estas; el ayre, e las aguas de las lluuia, e el mar, en su *ribera*. Ca qualquier criatura que biua, puede vsar de cada vna destas cosas, según quel fuere menester. E porende todo ome se puede aprouechar de la mar, e de su ribera, pescando . . . e faziendo y todas las cosas que entendiere que a su pro son." (Énfasis nuestro.)

Y la Ley VI: "Los ríos, e los puertos, e los caminos públicos pertenecen a todos los omes comunalmente; *en tal manera* que también pueden vsar dellos los que son de otra tierra estraña, como los que moran, e biuen en aquella tierra, do son." (Énfasis nuestro.)

Las Leyes IX y X hablan respectivamente de cuáles son las cosas propiamente comunales de cada Ciudad o Villa de que cada uno puede usar, y cuáles son aquellas del común de la Ciudad o Villa de que no puede cada uno usar. Se asoma ya aquí el concepto, luego más definido, de la diferencia entre bienes públicos patrimoniales del Estado y bienes de uso público, no susceptibles del comercio de los hombres.

El Título XXIX de la Tercera Partida dice que los sabios antiguos señalaron tiempos ciertos en que el hombre puede perder, o ganar el señorío de las cosas, y señala aquello que el hombre puede ganar lo ajeno por tiempo, o perder lo suyo. Así:

La Ley VII: "Plaza, nin calle, nin camino, nin defensa, nin exido, nin otro logar cualquier semejante destos que sea en *vso comunalmente* del Pueblo de albuna Cibdad, o Villa, o Castillo, o de otro Lugar, *non* lo puede ningund ome ganar por tiempo. Más las otras cosas que sean de otra natura . . . *maguer sean comunalmente* del Concejo de alguna Cibdad, o Villa, bien se podrían ganar por tiempo de quarenta años." (Énfasis nuestro.) Ya la propia Partida adelanta la explicación del porqué la diferencia entre unos y otros bienes comunales, y dice: "E esto es, porque maguer que *sean* de todos *comunalmente*, no vsan comunalmente dellos todos, assi como de las otras cosas sobredichas." (Énfasis nuestro.)

Estos conceptos se recogen en la Ley de Aguas española de 3 de agosto de 1866, extendida a Puerto Rico 5 días después por Real Orden de 8 de agosto. Dispone en su Art. 1 esta Ley que son de "dominio nacional y uso público:

1º Las costas o fronteras marítimas del territorio español, con sus obras, ensenadas, calas, radas, bahías y puertos.

2º El mar litoral, o bien la zona marítima que ciñe las costas, en toda la anchura determinada por el derecho internacional. [Se refiere al límite de millas mar afuera internacionalmente reconocido.]

3º *Las playas*. Se entiende por playa el espacio que alternativamente *cubren* y *descubren* las aguas en el movimiento de la marea. Forma su límite *interior* o terrestre la línea hasta donde llegan las más altas mareas y equinocciales. Donde no fueren sensibles las mareas, empieza la playa por la parte de tierra en la línea a donde llegan las aguas en las tormentas o temporales ordinarios." (Énfasis nuestro.)

El Art. 2 de dicha Ley, que aparece publicada en el tomo 96 de la Colección Legislativa de España, pág. 294, dispone:

"Tienen la consideración de puertos marítimos las *rías* y las *desembocaduras* de los ríos hasta donde se internan las embarcaciones de cabotaje y altura que hacen el comercio marítimo. Fuera de estos casos, las riberas u orillas de los ríos *conservan*

*su caracter especial de fluviales,* aun cuando estén bañadas por *las aguas del mar.*(⁹).

Art. 3º Son propiedad del Estado los fondeaderos, varaderos, astilleros, arsenales y otros establecimientos destinados *exclusivamente* al servicio de la marina de guerra. Lo son igualmente las islas formadas y que se formaren en la zona marítima, o en las rías y desembocaduras de los ríos, considerados como puertos marítimos según el Art. 2º. Más si las islas procediesen de haber un río cortado terrenos de propiedad particular, continuarán éstos perteneciendo a los dueños de la finca o fincas desmembradas.

Art. 4º Son del dominio público los terrenos que unen a las playas por las accesiones y aterramientos *que ocasione el mar.* Cuando ya no los bañen las aguas del mar, ni sean necesarios para los objetos de utilidad pública, ni para el establecimiento de especiales industrias, ni para el servicio de vigilancia, el Gobierno *los declarará propiedad* de los dueños de las fincas colindantes en aumento de ellas." (Énfasis nuestro.)

En el extenso y profundo estudio que hizo la Comisión de 1859 que redactó la Ley de Aguas de 1866, y que constituye su Exposición de Motivos—Alcubilla, *op. cit.,* pág. 341— después de expresarse que no pueden darse reglas sobre el aprovechamiento de las aguas públicas sin fijarse reglas claras y precisas, hasta ese momento no fijadas en las leyes civiles o administrativas, en virtud de las cuales quedaran perfectamente *definidas y deslindadas* las aguas pertenecientes al dominio público y al privado, ni se podían señalar los *cauces y riberas* que deben quedar del dominio público sin separarlos y deslindarlos de los que corresponden al dominio privado, dice la Comisión: (pág. 344).

"La Comisión ha creído, pues, que debía abstenerse de fijarla, limitándose a declarar que esa *zona marítima* territorial, cualquiera que sea la extensión que el derecho internacional le conceda, [se refiere al límite de millas mar afuera], pertenece al dominio público de la Nación, así como las obras, bahías, radas, calas y ensenadas formadas por las costas del territorio español y los puertos naturales o construidas con fondos públicos para

---

(⁹) El río Puerto Nuevo no es navegable en sitio alguno.

el servicio general, a diferencia de los construidos para el servicio exclusivo del Estado, que pertenecen al dominio particular de éste." (Énfasis nuestro.)

■ Más adelante expone la Comisión en su Exposición de Motivos:

"Por dominio público de la Nación entiende el que a ésta compete sobre aquellas cosas cuyo uso es común por su propia naturaleza o por el objeto a que se hallan destinadas; tales son, por ejemplo, *las playas, ríos,* caminos, muelles y puertos públicos; su *carácter principal es* ser *inenajenable e imprescriptible.* Y por dominio particular del Estado entiende el que a éste compete sobre aquellas cosas destinadas a su servicio, o sea, a la satisfacción de sus necesidades colectivas, *y no al uso común,* cosas de las que dispone como los particulares de las que constituyen su patrimonio: tales son, entre otras muchas, los *montes,* minas, arsenales, fortalezas y edificios militares." (Énfasis nuestro.)

Aún de mayor aplicación a la cuestión litigiosa que levanta el Estado Libre Asociado en este caso, dice la Exposición de Motivos:

"Al declarar también del dominio público de la Nación las playas, se ha creído conveniente restablecer la disposición de nuestras antiguas leyes que de acuerdo con las romanas, les fijaban por límite aquel donde alcanzan las olas del mar en sus temporales ordinarios, *espacio bastante para las necesidades* de la navegación y pesca; y en vez de la zona contigua de *20 varas,* que después se ha considerado como ensanche de aquellas, se establecen sobre las heredades limítrofes las *servidumbres de salvamento y vigilancia,* con las cuales quedan *suficientemente* atendidos los intereses de la navegación en casos de naufragios, y los de la Hacienda pública para vigilancia de las costas, sin necesidad de *condenar a perpetua esterilidad* terrenos que en algunas comarcas son susceptibles de cultivo." (Énfasis nuestro.)

Conforme a esta legislación, basta ver el ANEXO-A, que es también prueba del Estado recurrente, para captar la imposibilidad de que la Parcela Núm. 10, según deslindada en dicho Plano Oficial de 1919, pudiera bajo criterio alguno de

esa Ley, ser *playa*. Ya dijimos que el río Puerto Nuevo no es navegable. En la escala en que se levantó dicho Plano Oficial, 1:5,000, la porción más cerca al mar de la Parcela Núm. 10 que es su Norte y Oeste queda a unos 1,400 metros de la playa, o sea, casi a kilómetro y medio, comparado con la cinta de unos metros de terreno que cubren o descubren las olas en sus temporales ordinarios, o la línea de la marea más alta o la equinoccial.

■ Bajo el concepto de *montes*, la Parcela Núm. 10 podía haber sido de dominio del Estado, pero ya vemos que la propia Ley y su Exposición de Motivos *excluyen* los montes de entre aquellos bienes que por su naturaleza y uso, no son susceptibles de ser enajenados por el Gobierno, o de ser *poseídos* y prescritos por el individuo particular. A este respecto, confirmando lo anterior, el Art. 26 de la Ley de Aguas de 1866 dispuso:

"El gobierno podrá *conceder* para su desecación las *marismas* propias del Estado o de uso comunal de los pueblos, cuando oidos el Comandante de la Marina, el Jefe provincial de Ingenieros de caminos, el Gobernador de la provincio y la Junta consultiva de Obras Públicas en el Ministerio, conste que de ello no puede resultar perjuicio a la navegación de los ríos o conservación de los puertos.

Las *marismas* de *propiedad particular* podrán ser desecadas por *sus dueños* con licencia del Gobernador de la provincia. . . ." (Énfasis nuestro.)

■ La *marisma*, que como señalaremos luego, es considerada como *monte* se ha definido como terreno bajo y pantanoso que se inunda con las aguas del mar; y Alcubilla, Tomo 7, pág. 133, al referirse a las mismas dice que son terrenos bajos contiguos a las playas o riberas de los ríos que se inundan con las aguas extravasadas de los mares y los ríos; y que la Ley de 1866 disponía la *concesión* por el Estado para su desecación de aquellas que le pertenecían, y las reglas para la desecación de aquellas de *propiedad privada*.

En Sentencia del Tribunal Supremo de España de 28 de enero de 1878, en que un concesionario de terrenos que eran *marismas* demandó a otro particular para que éste los dejara a su disposición, y la demandada invocó ser dueña de los mismos por documentos que databan del Siglo XVII, dicho Tribunal revocó la sentencia de instancia que declaró que tales *marismas* eran de dominio público hasta la fecha de la concesión al demandante. Dijo el Tribunal Supremo que la sentencia recurrida infringía la Sentencia de 19 de diciembre de 1870, y el Art. 26 de la Ley de 3 de agosto de 1866 (Ley de Aguas) al declarar que *playa* y *marisma* son la misma cosa. Transcrita en el Tomo 7, Alcubilla, *op. cit.*, pág. 135.

En cuanto a la colindancia del río Puerto Nuevo respecta, dispuso la Ley en su Art. 72 que eran de dominio público los álveos y cauces naturales de los ríos; y en el Art. 73, que "se entienden por riberas de un río las fajas o zonas laterales de sus álveos que *solamente* son bañadas por las aguas en las crecidas que no causan inundación. El *dominio privado de las riberas* está sujeto a la servidumbre de *tres* metros de zona *para uso público*, en el interés general de la navegación, la flotación, la pesca y el salvamento." (Énfasis nuestro.)

Finalmente, de haber conflicto entre el derecho de los Ramos y el del Estado por razón de las disposiciones de la Ley de Aguas de 1866, y en lo que aquí respecta no captamos conflicto alguno, en sus Disposiciones Generales dispuso la misma, Art. 299: "Todo lo dispuesto en esta ley es *sin perjuicio* de los derechos legítimamente adquiridos con anterioridad a su publicación, así como también del dominio privado que tienen los propietarios de aguas de acequias, . . . ." (Énfasis nuestro.)

Sobre este Art. 299 dice la Exposición de Motivos: "Con dos disposiciones generales termina la ley; por la primera, [Art. 299] fundada en el sabido principio de que las leyes no deben tener efecto retroactivo, se declara que todo lo

dispuesto en ella es *sin perjuicio* de los derechos adquiridos antes de su publicación; . . . . (Énfasis nuestro.)

La Ley de Aguas de 1866 rigió en Puerto Rico hasta el 5 de febrero de 1886, en que por Real Orden se extendieron a la Isla la Ley de Aguas de 13 de junio de 1879, y la Ley de Puertos de 7 de mayo de 1880. La Ley de Aguas de 1879 sustituyó a la de 1866 sólo en cuanto a las aguas terrestres, con pocas modificaciones y no envuelta en el presente litigio. En cuanto a las aguas marítimas, fue sustituida por la de Puertos de 1880, que empezó a regir aquí según expresamos, en 1886.

Comenta Alcubilla, *op cit.*, pág. 341, que con la Ley de Aguas de 1879 y con la Ley de Puertos de 1880 en nada perdió su importancia y eficacia la Exposición de Motivos de la Ley de 1866.

La Ley de Puertos de 1880 según se hizo extensiva a Puerto Rico, dispone en su Art. 1 que "son de dominio nacional y uso público, *sin perjuicio* de los derechos que correspondan a los particulares:

1. La zona marítimo-terrestre, que es el espacio de las costas o fronteras marítimas de la Isla de Puerto Rico y sus adyacentes, que forman .parte del territorio español, *y que baña el mar* en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde no lo sean.

Esta zona marítimo-terrestre se extiende también por las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas." (Énfasis nuestro.)

Esta Ley reproduce casi todas las disposiciones sobre el dominio público de la zona marítima contenidas en la Ley de 1866 y dispone expresamente que: (Art. 1, incisos 7, 8 y 9)

"7. Los terrenos de *propiedad particular* colindantes con el mar *o enclavados en la zona* marítimo-terrestre, están sometidos a la servidumbre de salvamento y de vigilancia litoral.

8. Las servidumbres de salvamento tienen la misma extensión en los terrenos de *propiedad privada* colindantes con el mar, *que*

*la zona marítimo-terrestre, dentro de la cual están compren-*
*didos* y 20 metros más contados hacia el interior de las tierras,
y de ella se hará uso público en los casos de naufragio, para
salvar y depositar los restos, efectos y cargamentos de los bu-
ques náufragos.

.    .    .    .    .    .    .    .

Esta zona de servidumbre avanzará o se retirará conforme
el mar avance o retire, según queda establecido en general para
la zona marítimo-terrestre.

Por los daños causados a las heredades en las ocasiones de
salvamento habrá lugar a *indemnización,* . . . .

9. La servidumbre de salvamento no es obstáculo para que
los dueños de los terrenos contiguos al mar siembren, planten
y levanten, *dentro de la zona marítimo-terrestre, en terreno pro-*
*pio,* edificios agrícolas y casas de recreo." (Énfasis nuestro.)
(Ley de Puertos, 1880, Compilación de los Estatutos Revisados
y Códigos de Puerto Rico, Ed. 1941, pág. 92.)

En esta legislación el Estado Libre Asociado recu-
rrente hace descansar básicamente su derecho de propiedad.
El hecho amerita unas observaciones:

i. Dijimos antes que era imposible que la Parcela Núm. 10
fuera *playa* bajo la Ley de 1866 y el Plano Oficial, ni que allí,
a un kilómetro y medio de distancia, llegaran las olas.

ii. La Ley de 1880, antes transcrita, introduce el concepto
de "zona *marítimo-terrestre*" y la describe como aquel espacio
que baña el mar en su flujo y reflujo y la extiende hasta donde
son *sensibles* las mareas y las mayores olas en los temporales
cuando las mareas no sean sensibles.

iii. Asumiendo—el Estado no aportó prueba sobre el hecho
—que la Parcela Núm. 10 fuera lugar sensible a las mareas y
que con el cambio de éstas se extravasaran en ella las aguas
del mar, o sea, que la Parcela Núm. 10 era una *marisma,* ([10])
las disposiciones transcritas de esta Ley de 1880, aún en vigor,
al igual que aquellas de la Ley de 1866, plenamente reconocen
el disfrute de propiedad privada en este tipo de zona "marítimo-
terrestre", distinto al criterio del demandado de que son bienes

---

([10]) El Acta de los hallazgos de la Inspección Ocular del juez sen-
tenciador tiende a indicar lo contrario.

incapaces de ser enajenados por el Estado, e incapaces de ser *poseídos* particularmente.

iv. Aun cuando lo anterior no fuera correcto, esta zona "marítimo-terrestre" en la forma definida hasta donde son sensibles las mareas, se estableció por primera vez el 5 de febrero de 1886, años después que Ramos tenía inscrito en el Registro su título de propiedad. En consecuencia, todo sucesor en título de Ramos, como lo son los demandantes en este pleito, tienen la incuestionable protección del Art. 34 de la Ley Hipotecaria de 1883, como terceros que adquirieron de quien según el Registro podía transmitir. Posteriormente haremos referencia más en detalle al problema de tercero hipotecario. [11]

v. Finalmente, lo mismo que la Ley de 1866 que protegió los derechos ya adquiridos y a la cual, según su Exposición de Motivos, no se le deseó dar efecto retroactivo (Art. 299), la Ley de 1880, al declarar el dominio público expresa de inmediato que es, "sin perjuicio de los derechos que correspondan a los particulares", y respeta, como la anterior, a aquellos ya adquiridos.

En abono de su tesis, el Estado Libre Asociado presentó un Expediente Administrativo Núm. 175, de 1 de julio de 1895 (Ddo. Exh. L) en que Leopoldo Cerecedo, quien adquirió San Patricio en 1893—ante par. 2—y antecesor en título de los demandantes, presentó una instancia al Gobernador General pidiendo que se suspendiera el corte de mangle que por el personal de las obras del puerto se estaba haciendo en su hacienda San Patricio, causándole daño a su propiedad.

---

[11] Dispone el Art. 33 de la Ley Hipotecaria de 26 de mayo de 1893:
"La inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes."
Y el Art. 34:
"*No obstante lo declarado en el artículo anterior,* los actos o contratos que se ejecuten u otorguen por persona que en el Registro aparezca con derecho para ello *no se invalidarán en cuanto a tercero,* una vez inscritos, aunque después *se anule o resuelva* el derecho del otorgante en virtud de título anterior no inscrito o de causas que no resulten claramente del mismo Registro." (Énfasis nuestro.)
Los Arts. 33 y 34 de la Ley Hipotecaria Española que rigió en Puerto Rico desde el 1º de mayo de 1880 hasta ésta de 1883, disponían de igual manera.

Recibida la queja, se suspendió de inmediato el corte de mangle y se trasladó a otro sitio "en la margen izquierda del caño Pto. Nuevo, . . . interín se deslinda la verdadera zona donde deba hacerse la extracción."

Referido el asunto por la Junta de Obras del Puerto de la Capital al Ayudante encargado de las obras, hay un informe de 6 de agosto de 1895 dirigido al Ingeniero Jefe Director de las Obras. Dice el informe que el Sr. Cerecedo parecía incurrir en un error de apreciación "confundiendo los límites de su propiedad con los de la zona marítimo-terrestre." Para "poder desvanecer tales errores", entró en consideraciones sobre la planta de mangle y donde se produce. Dice:

"El mangle rojo, árbol cuya madera se utiliza como combustible para el movimiento de las máquinas de vapor del Tren de Limpia al servicio de las Obras del Puerto, es una planta especial, que nace solamente en las *marismas* o sea sobre los terrenos cenagosos bañados por las aguas del mar en el movimiento de las mareas. . . . . Por el medio especial en que vive esa planta, no se puede producir sobre otro terreno que no sea el salitroso bañado por el mar en el movimiento de sus mareas, ocupando por lo tanto la zona marítimo-terrestre de las costas bajas de esta Ysla. El límite de un manglar o sea su encuentro con el terreno vegetal de la Costa, *está determinado precisamente por la misma naturaleza,* pues en la unión de ambas zonas, *se desarrolla y crece,* otra planta especial que se denomina *marunguey* y que necesita para su nutrición, del terreno salitroso y del vegetal bañado por las lluvias, de suerte que, el menos avisado, *viene fácilmente en conocimiento del límite* de la zona marítimo-terrestre ocupada por los mangles en un sitio dado, *observando tan solo donde empieza a desarrollarse* la indicada planta de *marunguey,* que como ya se ha dicho, limita los terrenos vegetales de los salitrosos o *marismas* de la costa." (Énfasis nuestro.)

Interrumpimos aquí el informe para observar que del Acta de la Inspección Ocular que realizó la Sala sentenciadora, comenzada en el linde Norte y Oeste de la Parcela

Núm. 10, el Magistrado hace constar que caminando hacia el Este, a lo largo de la colindancia Norte, observó mangle a la orilla *izquierda* de un canal, probablemente el cauce anterior del río Puerto Nuevo antes de desviarse éste para desembocar ahora en el Caño Martín Peña, y a la derecha, o hacia el Sur, observó terrenos cubiertos de pasto natural, *marunguey* y arbustos de diferentes especies, incluyendo mangles y otras especies.

Concluyó el informe aludido que el corte se estaba haciendo en la zona del mangle, *sin que hubieran entrado para nada en el predio "San Patricio"*, y que no parecía fundada la queja. Recomendó el funcionario que se hiciera un deslinde de las expresadas zonas "fijando de una vez los límites en que quede comprendido *el mangle que pueda explotarse para los usos ya referidos.*" (Énfasis nuestro.)

En informe de 18 de julio de 1895 del Ingeniero Director al Presidente de la Junta de Obras del Puerto de la Capital, se expresa que el corte de mangle se había mantenido siempre dentro de los sitios detallados en la subasta en que se adjudicó a la Junta de Obras el aprovechamiento de los manglares del Estado sitos en Bayamón, sin que se rebasara, en ningún caso la parte contigua al límite del Sr. Cerecedo, el límite superior de la zona marítimo-terrestre "en que crece la planta especial llamada *marunguey.*"

Acepta el informe que era *"innegable* según dice el recurrente y es sabido de todos, *que dentro de la zona marítimo-terrestre* pueden existir *propiedades particulares"* (énfasis nuestro), pero que el reclamante no había mostrado documento alguno que demostrara que San Patricio se hallaba comprendido total o parcialmente dentro de dicha zona. Insiste este segundo informe que solo se lograría resolver el conflicto de un modo radical practicándose "el deslinde de la zona *en que puede verificarse* la explotación de la leña, a los usos referidos." (Énfasis nuestro.)

■ El anterior Expediente Administrativo contemporáneo con la adopción de la Ley de Puertos de 1880, no sostiene la tesis del recurrente de que las marismas, asumiendo que la Parcela Núm. 10 lo fuera, son bienes inenajenables y no susceptibles de dueño privado. Desautoriza también la conclusión de que los manglares, por el solo hecho de serlo, son necesariamente propiedad del Estado, y no prueba que el Gobierno Español fuera dueño de la Parcela Núm. 10, que luego pasara bajo el Tratado de París a Estados Unidos y bajo la Ley Foraker al Pueblo de Puerto Rico como bienes "para ser administrados" a beneficio del Pueblo. [12]

La Proclama del Gobernador de Puerto Rico de 28 de mayo de 1918, Boletín Administrativo Núm. 143, se expidió por autoridad del Art. 2 de la Ley Núm. 22 de 22 de noviembre de 1917, creando un servicio forestal. Autorizó esta ley al Gobernador para que, de tiempo en tiempo, *"después de oir en audiencia pública a los interesados"* (énfasis nuestro), declare bosques insulares todo terreno insular, y después de *las audiencias*, el Gobernador podía modificar o revocar o suspender cualquier proclama o parte de ella. (Art. 2.)

Entre las facultades concedidas por esta Ley al Comisionado de Agricultura, está la de arrendar, o de otro modo conceder la ocupación y uso de estos bosques del Estado. También para adoptar reglamentos referentes al uso, etc. y ocupación de los mismos, pero se le impuso la obligación de conceder *audiencia* a cualquier persona que se creyere perjudicada.

Se ordenó la mensura y deslinde de cualquier bosque insular incluyendo los terrenos cedidos de la Corona de España incluidos en cualquier bosque insular antes de perfec-

---

[12] No obstante el hecho que la Ley del Congreso de 1º de julio de 1902 cedió a Puerto Rico el dominio de aquellos bienes que Estados Unidos recibió de España que no fueran reservados por el Presidente en virtud de dicha Ley, la Carta Orgánica de 1917 volvió a repetir que eran "para ser administrados" a beneficio del Pueblo de Puerto Rico; y así se ha perpetuado en la actual Ley de Relaciones Federales.

cionarse la mensura y el título de los mismos, sin que lo dispuesto pudiera interpretarse "en el sentido de estar en oposición o conflicto con cualquier *derecho adquirido* por virtud de alguna concesión o concesiones . . . del Gobierno . . . ." (Énfasis nuestro.)

La Proclama de 1918 no declara que todos los manglares fueran de propiedad del Gobierno, sino que declaró bosques insulares los manglares pertenecientes al Pueblo de Puerto Rico. En la descripción y deslinde del que aquí se aplica, se dice en la Proclama que colinda por el Este con otros manglares. Si se hubiera intentado establecer que todos los manglares eran propiedad pública, la colindancia Este tenía que ser terreno vegetal firme. De lo que se desprende que la confección del Plano Oficial de 1919 no responde, como cuestión de derecho, ni a la Proclama, ni a la Ley Núm. 22 de 1917, ni a la legislación española aquí en vigor sobre el dominio de la zona marítimo-terrestre. El recurrente no ha aportado prueba del certificado de mensura del Plano de 1919 de donde surgiera haberse dado audiencia a los interesados y dueños colindantes, conforme lo exigía la referida Ley Núm. 22.

En *El Pueblo* v. *Dimas*, supra, dijimos a la página 1072 que los manglares se consideran como *montes* del Estado, aunque constituyan terrenos inundados. Véanse: Ordenanzas Generales de 22 de diciembre de 1833 descriptivas de los *montes*. Tomo 6, Scaevola, *op. cit.* (1891), pág. 143.

Por Real Decreto de 21 de abril de 1876, se proveyó para el deslinde y conservación de los montes y terrenos de la Corona existentes en Cuba y Puerto Rico, y se aprobaron las Ordenanzas para el Servicio del Ramo de Montes. En su Art. 1 se declaró que bajo la denominación de *montes* se comprenden "todos los terrenos destinados particularmente a la producción de maderas y leñas, y a las tierras de pastos no cultivados."

Se dividieron los montes en (1) montes públicos y (2) montes de particulares, definiéndose éstos como "los que con justo título pertenezcan al dominio privado." Se ordenó el deslinde de unos y otros conforme se dispuso, y se proveyó para que el Ingeniero Inspector de Montes presentara al Gobernador General dos catálogos de montes públicos: (1) los que por ser altos fueran necesarios para el suministro de servicios de guerra y marina, debían ser reservados de la venta y (2) aquellos montes que sin menoscabo de los intereses públicos, *debían pasar* al dominio particular. *Colección Legislativa de España*, tomo 116, pág. 360. Estos catálogos en verdad se hicieron y existían según se desprende de la prueba del recurrente. A esos catálogos e inventario se hace mención en *Pueblo* v. *Rojas*, supra, págs. 125–127.

■ Este Tribunal, a la pág. 1078 de *El Pueblo* v. *Dimas*, del volumen 18, ya citado, hace referencia a un *expediente de subasta* de aprovechamiento de varios montes del Estado, en que el Gobernador dispuso que por la alcaldía se procediera a anunciar la subasta y aprovechamiento de leñas del monte del Estado denominado *Manglar* de la parte norte de la bahía. Otra vez, judicialmente ahora, hay una expresión adicional que no comparte la tesis de que los manglares, o *marismas* de la zona marítimo-terrestre sean, *por solo esa condición de manglares*, bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de los hombres y no son enajenables por el Estado ni están sujetos a ser privadamente tenidos por los medios reconocidos de obtener título, inclusive, la posesión. Nuestra Asamblea Legislativa lo reconoció también así al aprobar la Resolución Conjunta Núm. 7 de 13 de mayo de 1927, que autorizó al Comisionado de lo Interior a *vender manglares* de El Pueblo de Puerto Rico.

La legislación común española contemporánea con la legislación especial de Aguas y Puertos, tampoco sostiene

la posición del recurrente. El Código Civil Español de 26 de mayo de 1889, en vigor en Puerto Rico el 1º de enero de 1890 y hasta el 1º de julio de 1902, dispuso en su Art. 339 que son bienes de dominio público: "Los destinados al uso público, como los 'caminos, canales, ríos, torrentes, puertos y puentes construidos por el Estado, las riberas, playas, radas y otros análogos'." No se mencionan manglares ni marismas como tal. El Art. 344: "Son bienes de *uso* público en las provincias y los pueblos los caminos provinciales y los vecinales, las plazas, calles, fuentes de aguas públicas, los paseos y las obras públicas de servicio general, costeadas por los mismos pueblos o provincias."

"Todos los demás bienes que unos y otros posean son patrimoniales y se regirán por las disposiciones de este Código, salvo lo dispuesto en leyes especiales."

El Art. 407 que trata del dominio público de las aguas no incluye la propiedad en litigio, aun cuando ésta fuera un manglar.

En ausencia de prueba del Estado Libre Asociado que impugnara el título inscrito de Antonio Ramos, su posesión con justo título escriturario desde 1815, ni que destruyera la condición de tercero hipotecario de los demandantes, no hay base para alterar la sentencia recurrida bajo el criterio que la Parcela Núm. 10, aun cuando participare dè la naturaleza de manglar o marisma—y en contrario concluyó la Sala sentenciadora—es un bien de uso público no susceptible de ser enajenado o cedido por el Estado, o de ser poseído en privado.

Tal vez con lo dicho sea suficiente para disponer de este recurso. Tratándose de bienes que hoy tienen un inmenso valor económico y que están inscritos a favor del Estado Libre Asociado, preferimos, no obstante, no dejar fuera del análisis nada que pueda reafirmar el convencimiento de juzgador, aun a costa de prolongar más esta exposición.

*El Pueblo de Puerto Rico*

v.

*Luis Llorens Torres,*
*Civil 12,685, Reivindicación*

Con más pujanza y fuerza persuasiva para la decisión de este caso que el análisis anterior interpretativo, están los hechos que quedaron perpetuados judicialmente en el pleito de reivindicación tramitado por El Pueblo de Puerto Rico contra Luis Llorens Torres en la entonces Corte de Distrito de San Juan.

En 16 de abril de 1920 el Gobierno interpuso demanda reivindicando un predio de 300 cuerdas que alegó Llorens detentaba sin título alguno. Obtuvo de inmediato un *injunction pendente lite* a base de que Llorens no sólo cortaba leña sino que hacía obras de roturación y cultivo.

Se describió la parcela como parte del manglar de 1,003.61 cuerdas declarado bosque insular por la Proclama de 28 de mayo de 1918, "colindante la misma por el Norte con aguas del río Puerto Nuevo; por el Este con aguas del mismo río y la Hacienda San Patricio; por el Sur con la Hacienda San Patricio, perteneciente hoy a Don Luis Rubert, con terrenos de la Sucesión, Ramos, antes, hoy de Don Luis Llorens Torres; y terrenos de Eduardo González Caneja antes, hoy de Don Eduardo y Don Celestino Iriarte, y por el Oeste con más manglares de El Pueblo de Puerto Rico."

No obstante estar ya deslindado el manglar de 1,003.61 cuerdas en el Plano Oficial de 1919 por puntos, ángulos, rumbos y distancias, y dividido en parcelas identificadas con los números 9, 10, 11, 12, no se dio en la demanda la descripción geométrica de este predio de 300 cuerdas, ni se situó en alguna de dichas parcelas numeradas.

Llorens negó la demanda, y alegó ser dueño de la finca Monterrey que describió de igual manera a como la tenía

inscrita según el deslinde que hizo con Rubert (véase el párrafo 6 anterior), excepto que alegó que tenía 397 cuerdas en lugar de 220.

Esta mayor cabida alegada motivó una estipulación de las partes radicada el 5 de agosto de 1924, en que acordaron que de la Finca Monterrey de 397 cuerdas descrita en la contestación de Llorens, el Pueblo sólo reclamaba 300 cuerdas *cenagosas*, y quedaban fuera del pleito 97 cuerdas *situadas en la parte seca*, o sea en la parte Sur. Describieron estas 97 cuerdas como colindando por "el Norte, con los terrenos cenagosos que reclama El Pueblo de Puerto Rico; por el Este, *con la quebrada Barraco que separa terrenos de Don Luis Rubert*; por el Sur, con los mencionados terrenos de Rubert y . . ., y por el Oeste con dichos terrenos cenagosos que reclama El Pueblo de Puerto Rico." (Énfasis nuestro.)

Debe observarse que ahora se identifica la quebrada Barraco, colindancia Oeste de Rubert y de la Parcela Núm. 10, como colindancia Este del terreno *seco* que se elimina del pleito.

El 5 de marzo de 1925 el Juez Charles E. Foote dictó sentencia en contra de Llorens y decretó la reivindicación. Se basó el Juez Foote fundamentalmente en lo que observó en su inspección ocular, y dijo: "la colindancia Norte de la finca del demandado es el Río Puerto Nuevo *solo hasta el punto* en que el mismo desemboca sus aguas en la bahía de San Juan, *y de ahí en adelante* dicha colindancia es la zona manglar que hemos descrito anteriormente [se refiere al manglar de 1,003.61 cdas.] y dentro de la cual está incluida la porción de terreno que reclama el demandante, siendo la línea divisoria, aquella más alta que marquen las aguas en el flujo y reflujo de la marea." (Énfasis nuestro.)

Si se tiene en cuenta que desde su origen la parte más cerca al mar de la finca San Patricio o su colindancia Oeste, nunca sobrepasó la quebrada Margarita, y según el ANEXO-B su desembocadura en el río aparece a 150 metros de la playa,

las observaciones del Juez Foote no estuvieron equivocadas.

Llorens apeló. No resolvimos el caso porque las partes estipularon su solución. En transacción que propusieron a la Corte de Distrito fechada 12 de febrero de 1931, El Pueblo de Puerto Rico aceptó que Llorens era un *tercero hipotecario* protegido por el Registro en cuanto a la cabida no aumentada de 220 cuerdas, "cuya cadena de título se ha comprobado desde el año 1815"; y pidió que se dictara sentencia decretando que Llorens era legítimo dueño de esas 220 cuerdas registradas, que se volvieron a describir en la misma forma expresada en el párrafo 6 anterior de esta opinión.

El demandado Llorens, por su parte, estuvo conforme en que se decretara que el Pueblo de Puerto Rico era legítimo dueño "de todo el terreno excedente situado entre las 220 cuerdas arriba descritas y la Bahía de San Juan, debiendo el demandado entregar la posesión de dicho terreno al demandante Pueblo de Puerto Rico."

Estipularon además las partes que las 220 cuerdas "se entenderán comprendidas desde la *Quebrada Verraco* [*sic*] que separa la finca del demandado de la Hacienda San Patricio de Don Luis Rubert, *hasta una línea recta y paralela* a la carretera, cuya línea se trazará *desde la Quebrada Margarita* hasta el Río Puerto Nuevo; y que *desde esta línea,* que será marcada por ingenieros del Departamento del Interior, el terreno restante, *hasta la Bahía de San Juan,* quedará de la propiedad de El Pueblo de Puerto Rico. Trazada esa línea, las partes *se obligan* a respetarla como línea divisoria entre ambas propiedades, renunciando a toda ulterior rectificación o deslinde entre ellas o sus causahabientes; y en consecuencia, El Pueblo de Puerto Rico renuncia a *todo derecho o reclamación sobre cualesquiera* otros terrenos reclamados en este pleito y poseído por Llorens que quedan situados al *este* de la referida línea paralela a la Carretera, que será trazada por ingenieros del Departamento del Interior y la cual servirá de límite en lo sucesivo entre los terrenos del Pueblo de Puerto Rico *y los de la antigua Hacienda San Patricio, hoy denominada San Patricio y Monte Rey.*" (Énfasis nuestro.)

La Carretera referida es la Núm. 2, que como puede verse en el Anexo-A, está considerablemente mucho más cerca del mar hacia el Oeste que la Parcela Núm. 10. No obstante, la prueba demuestra que El Pueblo pagó a Ramos, en 1913, el importe del terreno ocupado por esta carretera.

Conforme a la anterior estipulación, la Corte de Distrito de San Juan dictó sentencia final y firme en 18 de febrero de 1931, perpetuando judicialmente los pactos y declaraciones hechos por las partes.

El pleito de reivindicación terminó en realidad, como uno de deslinde, en que el Gobierno reconoció la quebrada Margarita como el límite Oeste de la Hacienda San Patricio según adquirida en 1815, y reconoció la quebrada Barraco como el límite Oeste de dicha hacienda después que la dividieron entre Monte Rey de Llorens, y San Patricio de Rubert. (Párrafo 6 anterior.)

Aun cuando Rubert podía indirectamente ser afectado por las resultancias del pleito de Llorens—de hecho aportó para sufragar los gastos del mismo—la sentencia mencionada no es aquí cosa juzgada, ya que Rubert no fue parte compareciente.

La aceptación que hizo El Pueblo de que Llorens era un tercero protegido por el Registro en lo que a sus 220 cuerdas inscritas se refiere, fue bien y correctamente hecha. Llorens incuestionablemente estaba protegido como tercero en esas 220 cuerdas inscritas—Art. 34 de la Ley Hipotecaria—aunque no en cuanto a las 197 cuerdas adicionales que alegó al contestar la demanda.

■ *A fortiori*, los demandantes son también terceros hipotecarios en cuanto a su cabida inscrita, ya que la cadena de título de ellos, como la de Llorens, tiene idéntico origen y proviene de la misma finca Núm. 89 matriculada en enero de 1882. (13)

-----

(13) En *El Pueblo* v. *Dimas,* supra, dijimos a la pág. 1075 que la demanda de reivindicación del Pueblo había sido declarada sin lugar en

La sentencia de deslinde de 1931 fue acatada por el Gobierno. El Plano Oficial de Manglares de 1919 quedó modificado para trazar en él el deslinde convenido y ordenado, y se trazó en dicho Plano la línea dentada (/ / / / / / /), al Este de la cual el Gobierno aceptó no tener reclamación alguna, y que sería la divisoria perpetua entre los terrenos del Estado y los de la "antigua Hacienda San Patricio".

Trasladado este hecho al ANEXO-A, se verá que esta línea límite está situada a 825 metros al Oeste de la quebrada Barraco, o dicho de otro modo, que la colindancia Oeste de la Parcela Núm. 10, la más cercana al mar, está a casi un kilómetro al Este de dicha línea divisoria, al Este de la cual el Gobierno aceptó no tener derechos de propiedad.

■ Después de esos hechos no acertamos a explicarnos cómo en 1940, diez años más tarde, y con el Plano Oficial de 1919 ya modificado conforme a la sentencia de 1931, el Comisionado del Interior pudo haberle certificado al Registrador la primera inscripción de la Parcela Núm. 10 a favor del Pueblo de Puerto Rico, como un bien obtenido de la Corona de España a través del Tratado de París, de la Sec. 13 de la Ley Foraker y de la Ley del Congreso de 1º de julio de 1902.

---

cuanto a los demandados Bosch y Riera "por estimar la corte sentenciadora que concurría en favor de ellos la condición de terceros por ellos alegada." En este caso se trataba de manglares, y el Gobierno no apeló el pronunciamiento del juez de instancia declarando a Bosch y a Riera terceros hipotecarios.

Este Tribunal continuó entonces considerando si los otros demandados contra quienes se declaró con lugar la demanda de reivindicación eran o no terceros, y concluimos que no lo eran. 18 D.P.R. 1075. No fue en el caso de Llorens la única vez que el Pueblo reconoció que pueden existir terceros hipotecarios protegidos por el Registro aun cuando se tratare de este tipo de zonas marítimo-terrestre. Cf. *Fajardo Sugar Growers Ass'n.* v. *Kramer*, 45 D.P.R. 348 (1933), manglares, en donde a la página 377 discutimos si allí había una condición de tercero y concluimos que no porque por el Registro, un posterior adquirente había quedado claramente informado del incumplimiento de un concesionario original de las condiciones impuestas para obtener título.

En el estudio de este caso hemos tenido el beneficio de una excelente labor realizada por el Juez Polo, Magistrado que falló en 1ra. Instancia. *Su sentencia, que declaró con lugar la demanda de reivindicación y ordenó la cancelación en el Registro de la Propiedad de la inscripción a favor del Estado Libre Asociado recurrente de la Parcela Núm. 10, según al presente está compuesta por un predio de 6.896 cuerdas y otro de 120.48 cuerdas después de la segregación a favor de Estados Unidos que no se litiga, será confirmada.*